Essex County Court of Common Pleas.

JUNIUS JORDAN, PETITIONER-APPELLEE, v. LINDEMAN & CO., INC., RESPONDENT-APPELLANT.

Decided June 6, 1945.

For the petitioner-appellee, *John A. Laird.*

For the respondent-appellant, *Foley & Francis (Gerald T. Foley).*

HARTSHORNE, C. P. J. Respondent appeals from the Bureau's award to petitioner on the grounds (1), that respondent is not a "contractor" within the meaning of the statute *R. S.* 34:15–79; *N. J. S. A.* 34:15–79, and that (2), petitioner had not earned any wages before the injury occurred.

It is undisputed that respondent, a coal dealer, had customarily engaged one Pentimone to help him with the latter's trucks in delivering coal to customers, some of which could be directly chuted from the wagon to the customers' coal bins, others of which had to be carried, and that the customers paid an additional charge of fifty cents for every "carry." Pentimone used a five-ton truck and was having some difficulty on a chuting job when he informally arranged for petitioner to help him. Petitioner's claim is that the arrangement was for Pentimone to pay him $3 a day. Pentimone differs, and the Bureau found as a fact that the arrangement was as Pentimone said to Jordan, "Well, I have some carries. I will pay you. You get fifty cents a ton for carrying * * *. If you will help me, I will help you carry coal, and whatever you make, it will be yours" (record, page 23). Pentimone also testified that any other work Jordan did for him was to be done in "consideration" for Jordan being paid for the carry jobs (record, page 49).

So Jordan went with Pentimone to Lindeman's yard and helped him in his deliveries. But before Jordan had delivered any "carry jobs," though while he was in the act of helping load a "carry job," Jordan was hurt.

Since Pentimone, Jordan's employer, was not an employee of respondent Lindeman but was an independent contractor, under ordinary circumstances, had Pentimone carried workmen's compensation insurance as required by the statute, Jordan could not have recovered against Lindeman, the general contractor. But since Pentimone had not taken out insurance, the Bureau held Lindeman responsible under the terms of the above section of the act providing that "Any contractor placing work with a subcontractor shall, in the event of the subcontractor's failing to carry Workmen's Compensation insurance as required by this article, become liable for any

compensation which may be due an employee or the dependents of a deceased employee of a subcontractor." *R. S.* 34:15–79; *N. J. S. A.* 34:15–79.

Respondent claims, however, that this section only applies to building contracts, relying on *Mitten* v. *O'Rourke*, 115 *N. J. L.* 177; 178 *Atl. Rep.* 797; *Gerber* v. *Sherman*, 15 *N. J. Mis. R.* 295; 191 *Atl. Rep.* 285; *Priby* v. *Lee*, 15 *N. J. Mis. R.* 292; 191 *Atl. Rep.* 105. True, in each of these cases a building contract was involved, but the point of such decisions was not that the statute applied to contracts concerning realty as distinguished from contracts concerning personalty, but that the owner of the land was not the "contractor" within the meaning of the above statute. This is clearly so by definition. A contractor is "One who formally undertakes to do anything for another; specifically, one who contracts to perform work, or supply articles * * *; stone contractor, road contractor, coal contractor, &c." *Webster's New International Dictionary* (*2d. ed.*). Clearly, one who pays for the work done or articles supplied does not "undertake to do anything for another," except to write a check. But not so with one engaged in the arduous duty of delivering and carrying coal.

Indeed, were the coal, which was being loaded by Jordan at the time he was hurt, intended for use in heating a building in winter, so that the workmen might complete or repair it under a contract, Jordan could recover even under respondent's contention. Surely, the fact that the coal in question might perchance have been intended for use in the ordinary heating of a building, cannot suffice to take the situation out of a statute which specifically covers *"any* contractor."

Respondent's contention indeed would largely defeat the very purpose of the statute. This is to protect an employee, whose direct employer violates the New Jersey policy by failing to take out compensation insurance, by permitting such employee to recover from the general contractor, who gets the direct benefit of, and is ultimately paid for, the work of such employee. This is no hardship on the general contractor, who gets the benefit of the work, and who could, and should, see that the work is sublet to responsible subcontractors who will

comply with the policy of the state. In effectuating this statutory purpose it makes no difference whether the work in question involves realty or personalty.

The further question remains whether petitioner has proven his "daily wages" upon the basis of which his compensation is to be calculated. *R. S.* 34:15–12; *N. J. S. A.* 34:15--12. These wages "mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident." *R. S.* 34:15–37; *N. J. S. A.* 34:15–37. Where an employee is injured in an accident arising out of and in the course of his employment, it is the "rate" as fixed in the "contract of hiring" which counts, not the actual money which has been paid the employee, nor the amount of money which he may have in fact earned during the part of the day which preceded the accident. If it were the latter, we would reach the absurd result that the disability compensation payable to the employee would differ, depending upon whether the accident occurred in the early part of the day, in the case of a daily wage, or in the latter part of the day.

That this "rate" was fixed in the contract of hiring here and that the employee was engaged in the course and scope of the employment at the time he was hurt, clearly appears from the evidence. While Jordan and Pentimone disagree as to the terms of the contract, they agree as to the fact that Jordan was actually engaged in working for Pentimone at the time he was injured and Pentimone says the work he was then doing was "done in consideration of his being paid for the carry job." (Record, page 49.) Indeed, the truck Jordan was then loading was "a carry." (Record, page 20.) Hence, the employee was hurt in an accident arising out of and in the course of his employment. Assuming Pentimone's version of the "rate" to be correct, as appellant claims, Jordan was to be paid at the rate of fifty cents per ton carried. The truck which Jordan was then loading for this "carry job" held five tons. So, had Jordan's accident not prevented him from completing the work he had started, he would have earned $2.50 on that particular load; and Pentimone adds that "a load or so" was to be carried that afternoon." (Record, page 48.)

The finding that Jordan's wages were fixed at a rate which would have netted him $3 for this, the first day of his employment, had not the accident intervened during the day, is therefore not an over-estimate. That it was in fact fair is corroborated—though corroboration is unnecessary, since the rate basis is that relied on by appellant—by Pentimone's own earnings on previous carries, as well as by Jordan's version that the contract was to pay him $3 a day straight. In any aspect then, the basis for the award is clear and fair. As for the possibility that Pentimone might have carried some coal himself, the burden of proving any such deduction from petitioner's wages rested on appellant. It cannot be heard to complain that same may have been of a speculative character.

The order of the Bureau is affirmed, and a determination may be entered accordingly.